**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ReBath LLC, | No. CV-21-00870-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Foothills Service Solutions Company, et al., | |
| Defendants. | |

In 2017, Plaintiff ReBath LLC ("ReBath") executed a franchise agreement with Defendant Foothills Service Solutions Company ("Foothills") that allowed Foothills to operate a ReBath franchise in North Carolina.  In May 2021, the parties' business relationship broke down, prompting ReBath to announce that it was terminating the franchise agreement and Foothills to dispute whether the termination was proper.  The parties then rushed to court and filed dueling lawsuits with dueling temporary restraining order ("TRO") requests.  After the lawsuits were consolidated, the Court held a TRO hearing on June 3, 2021.  For the reasons that follow, ReBath's motion is granted in part and denied in part and Foothills' motion is denied.

## BACKGROUND

I.    Factual Background

The following facts are derived from documentary evidence admitted during the TRO hearing and from witness testimony during that hearing.

ReBath is the country's largest bathroom remodeling company.  It offers remodeling

services through 107 franchises in 45 states.  ReBath also manufactures and sources some remodeling products and sells those products to its franchisees.  (Ex. 4 at RB49.)[1]  ReBath trains and supports its franchisees using a variety of materials, methods, standards, strategies, policies, procedures, techniques, training, specifications, and accumulated experience that ReBath collectively calls the "System."  (*Id.*)  The System is compiled in ReBath's confidential Systems Manual (the "Manual").  (*Id.*)  ReBath also has various "trade names, trademarks, service marks, tradestyles, logos, [and] designs" that are used in connection with operating a ReBath franchise (the "Marks").  (*Id.*)  Together, the Court will refer to ReBath's Marks and confidential and proprietary material, including the System and the Manual, as ReBath's intellectual property ("IP").

By entering into franchise agreements, franchisees gain the benefit of ReBath's IP, brand, goodwill, products, and support.  The flipside, as ReBath CEO Brad Hillier ("Hillier") testified, is that ReBath retains significant control over these benefits, merely loaning the Manual to franchisees, designating all aspects of the System and Manual as confidential, and requiring their immediate return—as well as the immediate disuse of all IP—upon termination of a franchise agreement.  (*See also id.* at RB63, RB71, RB89.)

On January 31, 2017, ReBath entered into a franchise agreement (the "Franchise Agreement" or the "Agreement") with Foothills for a ten-year term.  (Ex. 4 at RB55, RB101.)  Under the Agreement, Foothills would operate in the Charlotte, North Carolina area, gaining the benefit of ReBath's IP, products, and support.  (*Id.* at RB49-50, RB103.)  Foothills, in turn, promised among other things to pay monthly royalties on its sales (*id.* at RB67) and to purchase a yearly quota of ReBath products (*id.* at RB52).  Foothills also promised that after the Agreement terminated or otherwise expired, it would not operate or otherwise engage in any business offering similar products or services within a 20-mile radius of the Charlotte-area territory.  (Ex. 5 at RB91-92.)  Defendant Norman Christopher Woods ("Woods"), Foothills' president, signed the Agreement on behalf of his company

---

[1]      The Court cites the parties' stipulated exhibits.  Specific page numbers are cited by Bates number.  Leading zeros in the Bates numbers are omitted.

1   and also signed a payment and performance guarantee as personal guarantor of Foothills'

2   performance under the Agreement.  (*Id.* at RB101, RB105-06.)[2]

3       Foothills performed its contractual duties without major incident throughout 2017,

4   2018, and 2019.  Hillier testified that Foothills had some financial trouble, which the parties

5   discussed over the phone around fall 2019, but his concerns were assuaged by the fact that

6   ReBath was negotiating a nationwide Installation Services Agreement with home

7   improvement retailer Lowe's—if Foothills could participate in this program, its sales

8   would likely increase.

9       On December 5, 2019, ReBath entered into the Lowe's agreement.  (Ex. 7 at

10  RB131.)  On January 13, 2020, Foothills signed an agreement with ReBath to participate

11  in the Lowe's program.  (Ex. 8 at RB164, RB171.)  Sales derived from the Lowe's program

12  ended up constituting around 40 percent of Foothills' business in 2020 and during the first

13  four months of 2021.  (Ex. 33 at RB228.)

14      Beginning in May 2020, Lowe's and ReBath began to complain about issues with

15  Foothills' performance, in particular its "spill rates"—that is, the number of customer

16  inquiries and referrals not converted into final sales—as well as its "lead times," or the

17  number of weeks between when a customer would purchase the renovation and Foothills

18  would complete it.  (Exs. 13-15, 18, 21 ¶¶ 5-6, 111, 116, 119.)  Although ReBath and

19  Foothills attempted to implement various strategies to improve Foothills' spill rates and

20  lead times (Exs. 12, 16-21, 31, 109-10), these efforts ultimately did not allay Lowe's

21  concerns, as explained further below.

22      It should be noted that Foothills' business in 2020 and 2021 was not without its

23  bright spots.  In a 2020 customer survey of all ReBath franchises, Foothills had the highest

24  reputation score in the entire country.  (Ex. 103.)  Year-to-date sales figures for the

25  Foothills franchise show that, in 2021, Foothills was on track to meet or exceed its 2020

26  sales.  (Ex. 33.)  And in the Court's view, Woods testified credibly and sincerely that

27

28  ───────────────
    [2]      For convenience, the Court uses the term "Foothills" generally to refer to both
    Defendants, unless discussing Woods specifically.

although it had taken time for Foothills to establish itself, things were improving and the business was overall doing well.  Hillier's testimony also acknowledged that Foothills had been successful in certain aspects of its business.

Nevertheless, Lowe's cancelled its arrangement with Foothills on April 14, 2021. (Ex. 32.)  Woods learned this news during an April 19, 2021 phone call (Ex. 21 ¶ 10) and received formal notice in a May 4, 2021 letter.  (Ex. 9.)

ReBath was distressed by Foothills' exclusion from the Lowe's program.  Hillier feared that, given Lowe's significance to Foothills' overall sales, this development would render Foothills' business unsustainable.  Hillier was also concerned that not having a ReBath franchise operating under the Lowe's program in Charlotte, which Hillier stated is a particularly important market for Lowe's, could jeopardize ReBath's national relationship with the retailer.

Notwithstanding these concerns, the validity of the ReBath-Foothills Franchise Agreement was not contingent on Foothills' continued participation in the Lowe's program.  This created a dilemma for ReBath, which hoped to replace Foothills as a franchisee but could not invoke the Lowe's situation as the basis for terminating the Franchise Agreement.

ReBath thus explored two different paths for replacing Foothills as a franchisee. The first was to locate a different ReBath franchisee who might be interested in buying out Foothills and taking over the Charlotte territory.  (During the TRO hearing, Hillier characterized this as a "kind of brokered outcome [that] might ultimately produce the best result.")  ReBath was able to identify such a franchisee and presented the idea to Woods (Exh. 21 ¶ 12), but as discussed in more detail below, the idea ultimately fizzled.

The other path was to formally terminate Foothills as a franchisee based on violations of the Franchise Agreement.  To that end, on April 26, 2021, Hillier, on behalf of ReBath, sent Woods a letter (the "Notice of Default") stating that Foothills was in default under the terms of the Franchise Agreement.  (Ex. 104.)  The Notice of Default invoked two bases for default: (1) past-due royalty payments of $19,240.36 and (2) past-due product

purchase payments of $31,690.80.  (*Id.*)  The Notice of Default further stated that, under § 24.A.8 of the Franchise Agreement, Foothills had 30 days to cure the defaults or be terminated.  (*Id.*; *see also* Ex. 4 at RB86 [§ 24.A.8].)  The letter concluded with a note that "[n]othing contained or omitted from this notice is intended to constitute an election of remedies or a waiver, release for modification of ReBath's rights under the Franchise Agreement or otherwise.  ReBath retains all rights and remedies available at law and in equity."  (Ex. 104 at FSS255.)

On May 6, 2021, Foothills (via Woods) paid the $19,240.36 in royalties.  (Ex. 105.)

That same day, only a few hours later, Woods received a new letter (the "Notice of Termination") from Hillier.  (Ex. 5.)  This letter formally gave notice that the Franchise Agreement between ReBath and Foothills was terminated.  (*Id.* at RB117.)  The two grounds for termination cited in this letter were distinct, in certain respects, from the grounds identified in the Notice of Default.  First, the Notice of Termination stated that Foothills violated the Agreement by underreporting its sales by more than one percent 19 times in the prior 39 months and three times in the prior 12 months.  (*Id.*; Ex. 4 at RB67-68.)  Under § 24.A.10 of the Agreement, a default occurs when a franchisee underreports sales "by more than 1% on two or more separate occasions during the [ten-year] Term." (Ex. 4 at RB86.)  Second, the Notice of Termination stated that Foothills was late in paying its royalty fees and product purchases.  (Ex. 5 at RB117-18.)  The underlying late payments were the same as those cited in the Notice of Default, but, unlike that letter, the Notice of Termination stated that the untimeliness of the payments—regardless of Foothills' attempts to cure within a 30-day period—constituted an event of default under the terms of the Agreement.  To support this conclusion, the Notice of Termination cited § 24.A.20 of the Agreement, which states in relevant part that a franchisee's failure "on three or more separate occasions within any 12 consecutive month period to . . . pay when due fees or payments owed to [ReBath] or its affiliates" constitutes a default.  (*Id.*; Ex. 4 at RB87.) The Notice of Termination then stated that "ReBath expects" Foothills to comply with all of its post-termination obligations, including, in relevant part, that Foothills "[c]ease . . .

use of ReBath's marks and business system," "[p]rovide to ReBath a complete customer list," and "[c]ancel or Transfer to ReBath all identifiers." (Ex. 5 at RB118; *see also* Ex. 4 at RB89-90 [Agreement provisions setting out post-termination obligations].) ReBath reserved all of its rights and noted that ReBath wished "to work with [Foothills] to effect an orderly wind down of [the] franchise." (Ex. 5 at RB118.) Attached to the letter were documents purporting to support the proffered bases for termination. (*Id.* at RB119-25.)

On May 13, 2021 Foothills (via Woods) paid the overdue product purchase fees. (Ex. 106.) That same day, Woods wrote Hillier a letter ("May 13 Letter") disputing the claims in the Notice of Termination. (Ex. 107.) Specifically, this letter stated that Foothills had cured and intended to cure the payment violations within the 30-day cure period, disputed the validity of the other grounds for termination, and intended to remain open for business notwithstanding the purported immediate termination. (*Id.*)

Against this backdrop, ReBath and Foothills were trying to resolve what to do about Foothills' existing Lowe's accounts. (*See, e.g.*, Ex. 25 [May 5-6 emails discussing Lowe's account wind-down].) As noted, Hillier had previously tried to broker a deal between Foothills and a replacement franchisee as a cooperative way to resolve the Lowe's accounts and manage the transition to the new franchisee. (Ex. 21 at RB202 ¶ 12.) Woods, however, continued to contact Lowe's personnel to discuss ways to improve the business, rather than acknowledging that the program had terminated. (Ex. 115.) This convinced Hillier that the parties would no longer be able to resolve the transition amicably. Thus, instead of moving forward with a gradual wind-down of Foothills' existing Lowe's contracts, as had been the original plan (Ex. 9), ReBath opted to terminate Foothills' Franchise Agreement. Even after the termination, however, Foothills and ReBath were in communication about an orderly wind-down of Lowe's jobs. (Ex. 108 [email dated May, 11, 2021].) But after Woods' May 13 Letter stating that Foothills was staying in business and did not agree that the Franchise Agreement had terminated, ReBath decided it had to act immediately to protect its IP, brand, and the integrity of its nationwide franchise system. (Ex. 24 at RB208-09 ¶¶ 4-10.) According to Woods, among the actions ReBath has taken are removing

- 6 -

Foothills' Facebook page, altering Foothills' Google page to say that Foothills is permanently closed, telling Foothills' customers that ReBath's Charlotte franchise would be under new ownership, cutting off Foothills' access to ReBath's management software, and contacting Foothills' employees to offer them jobs with the new franchisee.

II.   Procedural History

On May 17, 2021, ReBath filed its complaint.  (Docs. 1, 6-7.)

On May 18, 2021, ReBath filed its TRO motion.  (Doc. 13.)  This motion later became fully briefed.  (Docs. 26, 32.)

Also on May 18, 2021, Foothills filed its complaint in the District of Arizona in a separate action originally assigned to Judge Liburdi.  *Foothills Serv. Sols. Co. v. ReBath LLC*, 2:21-cv-00880 (May 18, 2021) (Doc. 1) [hereinafter cited as "Foothills Compl."].

The same day, Foothills filed its TRO motion.  *Id.* (Doc. 2) [hereinafter cited as "Foothills TRO Mot."].  This motion later became fully briefed.  (Docs. 28, 33.)

Sometime between May 18 and 20, 2021,[3] ReBath's counsel sent Foothills' counsel a cease-and-desist letter informing Foothills of the instant lawsuit and demanding that Foothills stop operating its enterprise in the noncompete zone established in the Franchise Agreement and using any ReBath Marks or other branding.  (Ex. 22.)

On May 24, 2021, ReBath filed an unopposed motion to consolidate Foothills' case with the instant case.  (Doc. 21.)  That motion was granted.  (Doc. 23.)

On June 3, 2021, the Court held a hearing on the TRO motions.  (Doc. 35.)  Hillier and Woods testified in person.

**THE PARTIES' CLAIMS AND TRO MOTIONS**

I.   ReBath

ReBath's complaint asserts six causes of action: (1) trademark infringement under 15 U.S.C. § 1114(1); (2) unfair competition and false designation of origin under 15 U.S.C. § 1125(a); (3) common law trademark infringement and unfair competition; (4) trade secrets violation under 18 U.S.C. § 1836; (5) misappropriation of trade secrets under

---

[3]     The letter is dated May 20, 2021, but Woods said he received it on the 18th or 19th.

A.R.S. § 44-401; and (6) breach of contract, including but not limited to breach of the Franchise Agreement's noncompete and post-termination provisions.  (Doc. 1 at 15-21.)

ReBath seeks a TRO restraining Foothills and Woods (and any associates, agents, employees, and so on) from using or associating with the ReBath brand or IP; misrepresenting in any way an affiliation with ReBath or a right to use ReBath's IP; operating any business that gives the impression of an affiliation with ReBath; operating any bathroom remodeling business within a 20-mile radius of the Charlotte-area territory; and engaging in any unfair competition against ReBath.  (Doc. 13-1.)

II.    Foothills

Foothills' complaint asserts four causes of action: (1) an equitable action seeking injunctive relief against ReBath's termination of the Franchise Agreement; (2) an action seeking declaratory relief that Foothills is in compliance with the Agreement and that ReBath's termination constitutes breach; (3) breach of contract based on the termination; and (4) breach of the implied covenant of good faith and fair dealing based on ReBath's terminating the Agreement, ignoring Foothills' requests to mediate, and conspiring to transfer Foothills' franchise territory to a new franchisee.  (Foothills Compl. at 7-10.)

Foothills seeks a TRO restraining ReBath (and its agents, employees, and so on) from terminating the Franchise Agreement, moving forward with any plans to transfer Foothills' territory to a new franchisee, communicating with any of Foothills' customers regarding change in ownership, or deleting or taking off-line any of Foothills' websites. (Foothills TRO Mot. at 18-19.)

## DISCUSSION

I.    Legal Standard

A motion for TRO is analyzed under "substantially identical" standards as a motion for preliminary injunction.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (internal quotation marks

1    omitted).  *See also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A
2    preliminary injunction is an extraordinary remedy never awarded as of right.").  A plaintiff
3    seeking a preliminary injunction must show that (1) it is likely to succeed on the merits,
4    (2) it is likely to suffer irreparable harm without an injunction, (3) the balance of equities
5    tips in its favor, and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 20.

6         However, "if a plaintiff can only show that there are 'serious questions going to the
7    merits'—a lesser showing than likelihood of success on the merits—then a preliminary
8    injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor,
9    and the other two *Winter* factors are satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc.*,
10   709 F.3d 1281, 1291 (9th Cir. 2013) (quotation and emphasis omitted).  Under this serious-
11   questions variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger
12   showing of one element may offset a weaker showing of another."  *Lopez*, 680 F.3d at
13   1072.  Regardless of which standard applies, the movant "carries the burden of proof on
14   each element of the test."  *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016,
15   1027 (E.D. Cal. 2000).

16   II.   Analysis

17        The key issue at the heart of this case is whether ReBath had the right to terminate
18   the Franchise Agreement.  As explained below, the Court finds that ReBath likely had the
19   right to terminate.  ReBath has further shown its entitlement to the remedies set out in the
20   Franchise Agreement with respect to its Marks and trade secrets, because it has
21   demonstrated a likelihood of success on the merits, irreparable harm, the balance of
22   equities, and that a TRO would be in the public interest with respect to those two categories
23   of claims.  ReBath has also met its burden with respect to its breach of contract claim
24   insofar as the claim is for violating the Franchise Agreement's post-termination
25   obligations.  ReBath has failed to meet its burden, however, with respect to the noncompete
26   component of its breach of contract claim, because it has not shown a likelihood of success
27   on the merits or irreparable harm with respect to the covenant not to compete.

28        Foothills has not met its burden.  Foothills has not shown a likelihood of success on

the merits with respect to the propriety of the termination.  Even if it could show a serious question going to the merits, moreover, Foothills has not demonstrated irreparable harm.

A.   **ReBath's Motion**

1.   Likelihood Of Success On The Merits

a.   **Mediation/Arbitration**

A threshold question underlying both parties' motions is whether this dispute is properly before the Court under the terms of the Franchise Agreement.[4]  The Agreement's choice-of-law and dispute resolution provisions are set out in § 32.  (Ex. 4 at RB96-99.) Among other things, § 32 mandates that, with one exception discussed further below, the parties must attempt to mediate disputes before filing suit:

> Except as provided in Section 32.F., the parties shall first attempt in good faith to resolve any Dispute by mediation.  If a party commences any legal action, other than as provided for in Section 32.F., without having first complied with all of the provisions of this Article 32.C regarding mediation, the other party shall be entitled to a 30 day abatement of the legal action upon filing the appropriate procedural motion in the legal proceeding . . . .

(*Id.* at RB96.)  The exception, set forth in § 32.F, provides:

> If a situation arises relating to Franchisee's use of the Marks, the System, or the Confidential Information and the Company believes it will suffer irreparable loss or damage unless the Company takes immediate action, including . . . conduct alleged to be in violation of covenants set forth in this Agreement, the Company shall be free to seek restraining orders, preliminary injunctive relief, or other interim relief from any court of competent jurisdiction, and in this instance, a court may also decide claims for damages related to the Dispute.

(*Id.* at RB98.)

ReBath argues that, because it is seeking injunctive relief related to its IP, its claims

---

[4]     The Court notes that both parties allege that the Court has jurisdiction and that venue is proper.  (Doc. 1 ¶¶ 13-17; Foothills Compl. ¶¶ 9-11.)  ReBath invokes federal question jurisdiction under the Lanham Act as well as diversity jurisdiction.  (Doc. 1 ¶ 9.)  Foothills invokes diversity jurisdiction for its claims.  (Foothills Comp. ¶ 13.)  Based on the nature of the parties' allegations and their states of citizenship, the Court concludes that it has subject matter jurisdiction over both parties' actions.  Further, the Franchise Agreement provides for actions to be filed in the District of Arizona.  (Ex. 4 at RB98.)  The Agreement is governed by Arizona law except to the extent that the Lanham Act or Federal Arbitration Act apply.  (*Id.* at RB96.)

fall within § 32.F and it is thus exempt from § 32's usual requirement to "first attempt in good faith to resolve any Dispute by mediation."  For similar reasons, ReBath argues that its claims fall outside the Agreement's arbitration clause.  (*See* Ex. 4 at RB98.)[5]  In contrast, ReBath argues that *Foothills'* claims are arguably subject to the mediation and arbitration clauses but clarified during the TRO hearing that it has chosen, in the interest of judicial economy, to allow both parties' TRO arguments to be heard together.  (Counsel further clarified that ReBath has not waived its ability to enforce the arbitration clause during future stages of this case.)  Meanwhile, Foothills' position seems to be that ReBath's TRO motion is not properly before the Court and instead is subject to mandatory mediation.  (Doc. 26 at 9 ["ReBath has failed and/or refused to withdraw the termination pending contractually-mandated mediation . . . ."].)  During oral argument, Foothills' counsel elaborated that ReBath's interpretation of § 32 is nonsensical because in effect it means that while the parties are forced to mediate or arbitrate the validity of termination, ReBath can obtain a restraining order or injunction that could effectively put the franchisee out of operation.  As Foothills' counsel put it: by that point, what's left to mediate?

The Court understands Foothills' point, but the plain language of the contract supports ReBath's interpretation.  Section 32.F affords ReBath the right to seek injunctive relief so long as "a situation arises relating to Franchisee's use of the Marks, the System, or the Confidential Information and the Company believes it will suffer irreparable loss or damage unless the Company takes immediate action, including but not limited to a situation involving threatened or actual conduct alleged to be in violation of the covenants set forth in this Agreement."  (Ex. 4 at RB98.)  This is precisely such a "situation."  It follows that

---

[5]      The relevant language of the arbitration clause is: "Except as provided in Section 32.E. and 32.F., all claims, controversies, and disputes arising out of or related to this Agreement must be submitted to arbitration."  (Ex. 4 at RB98.)  Section 32.E provides that the following categories of disputes "will not be resolved through arbitration unless the Company consents to arbitration": "(i) disputes that arise under or are related to the Lanham Act, as now or later amended; (ii) disputes that otherwise relate to the ownership or validity of any of the Marks or any other elements of the System; (iii) disputes that involve enforcement of the Company's intellectual property rights or protection of the Confidential Information; or (iv) disputes related to the payment of sums Franchisee owes the Company or its affiliates."  (*Id.*)

1    when, as here, ReBath wishes to terminate a franchise, and the franchisee is uncooperative,

2    ReBath can seek an order to protect its IP even though the franchisee disputes whether the

3    stated grounds for termination were valid.  Although this one-sided exception is favorable

4    to ReBath, that is how the contract is written, and the Court has a duty to give effect to the

5    terms of the contract.  *Grosvenor Holdings, L.C. v. Figueroa*, 218 P.3d 1045, 1050 (Ariz.

6    Ct. App. 2009) ("A general principle of contract law is that when parties bind themselves

7    by a lawful contract, the terms of which are clear and unambiguous, a court must give effect

8    to the contract as written.").

9                                            b.    **Termination**

10          As noted, although ReBath gave notice to Foothills on April 26, 2021 that the

11   Franchise Agreement was "subject to termination" due to unpaid royalties and product

12   purchase payments and offered Foothills 30 days to cure these defaults (Ex. 104), ReBath

13   ended up terminating the Agreement on different grounds on May 6, 2021, well before the

14   30-day cure period expired (Ex. 5).  In the Notice of Termination, ReBath asserted that

15   termination was proper for two reasons: (1) Foothills underreported its sales figures by

16   more than one percent on two or more separate occasions; and (2) Foothills failed to pay

17   fees or payments when due on three or more separate occasions within any 12 consecutive

18   month period.  (Ex. 5; Doc. 32 at 2-3.)

19                                       i.    Underreporting Of Sales Figures

20          On this record, the Court concludes that ReBath has not met its burden of showing

21   a likelihood of success on the merits of the underreporting-of-sales issue.

22          The sole documentary evidence of Foothills' underreporting is a single-page

23   printout of what appears to be an Excel spreadsheet showing Foothills' sales reports from

24   January 2018 to March 2021.  (Ex. 5 at RB120.)  This document was attached to the

25   termination letter.  It is notable to the Court that no declarations or other materials were

26   submitted alongside it to attest to its accuracy or the validity of its methodology.  As noted

27   during the TRO hearing, Foothills disputes that it ever misreported its sales, arguing that

28   the discrepancies in the spreadsheet must be the product of a lack of clarity around how to

report sales or errors in ReBath's calculations.

The Court acknowledges that ReBath did submit some additional evidence, on top of the spreadsheet, in an effort to prove its underreporting-of-sales claim.  ReBath CFO David Japhet's declaration includes, among other things, an attestation that Foothills "has been a systemic under reporter of sales" and "underreported sales to ReBath 19 times by more than 1% since January 31, 2018," which is consistent with the spreadsheet.  (*Id.*; Ex. 10 at RB181 ¶ 4.)  Japhet also declares "[t]here is no possible way Foothills is confused or misunderstands the methodology for reporting sales to ReBath, nor is there an error in ReBath's calculations, nor could Foothills reasonably dispute that it has ever underreported its sales." (Ex. 10 at RB 182 ¶ 9.)  The problem with these assertions, however, is that they are *ipse dixits* devoid of any explanation of where the numbers in the spreadsheet actually came from (and why they are accurate).

The Court also appreciates that Hillier testified at length during the TRO hearing in an attempt to explain the spreadsheet, including how it was generated and updated and how a ReBath franchisee "reports" sales.  Hillier's testimony was credible.  Nevertheless, this testimony ultimately did not persuade the Court that ReBath is likely to prevail on the claim that Foothills underreported sales in violation of the Franchise Agreement.  Hillier testified that the spreadsheet showed the exact numbers from ReBath's system.  So far, so good.  But Hillier's explanation of how these numbers are generated did not sufficiently establish that Foothills in fact underreported.  Hillier explained that on the seventh or eighth day of each month, franchisees sync their QuickBooks records with ReBath's financial system, at which point the system takes a timestamp of the figures and calculates the royalties to be billed to the franchisees based on this timestamp.  The system, however, continues to take live data from the franchisees' QuickBooks records, and then sometime near the end of the month the system syncs with the franchisees' QuickBooks records a second time, and if the revenue number is different on this second sync, the system creates a report noting the existence of a difference.

This explanation, although clear enough, raises some questions which, at this point

in the case, ReBath has not sufficiently answered.  For one thing, the process Hillier described seems to differ from the process spelled out in the Franchise Agreement.  Section 13.E of the Agreement states that on or before the seventh day of each month, a franchisee must "submit . . . a correct statement, [that is] signed."  (Ex. 4 at RB67.)  However, Hillier testified that franchisees do *not* affirm or sign any reporting statement, or indeed that there is any kind of standalone statement that a franchisee could review and then submit.  Rather, Hillier's testimony indicated that Foothills was merely on notice to "sync" its QuickBooks records with ReBath's system by the seventh day of each month, which franchisees may set up to occur automatically or with the push of a button.[6]  Then, in an opaque process, the system automatically determines whether there have been any changes after the seventh day of each month and flags any such differences.  Even if there is some autogenerated mismatch at this point, that does not seem, in the Court's view, to be sufficient evidence that Foothills thereby underreported its sales in violation of the relevant provisions of the Franchise Agreement.  It seems just as plausible that some error in the franchisee's QuickBooks, in ReBath's system, or in how the numbers are interpreted might be to blame.  True, § 13.E says that the sales report "shall be submitted electronically as prescribed by [ReBath]," but the electronic report described by Hillier sounds more like one autogenerated by an internal ReBath system than one signed and submitted by a franchisee.  ReBath seems to argue that because its autogenerated report says there was a difference between the amounts captured at the seventh versus the end of the month, *ipso facto* Foothills has misreported.  That is not enough, at least on this record and in light of the burdens of proof applicable at the TRO stage.

Finally, the Court acknowledges that the accuracy of the spreadsheet is arguably bolstered by Woods' October 2020 communications with ReBath agents regarding Foothills' sales reporting issues.  (Exs. 112, 120-21.)  This evidence suggests that a ReBath agent told Woods in October 2020 that Foothills had been misreporting its sales on many

---

[6]     Woods said that he believed Foothills' QuickBooks syncing occurred automatically.

occasions.[7]  In his live testimony, Woods stated that he first learned of this issue in the fall of 2020 and Foothills subsequently tightened up its reporting.  This account is in turn supported by the spreadsheet itself, which states that from November 2020 to March 2021, Foothills' sales reports, as captured by ReBath's system, were more accurate.  Although these developments lend *some* support to the spreadsheet, they do not adequately resolve underlying uncertainties about how reports are in fact submitted, how ReBath's system captures the difference, and why the presence of the difference as captured by the system is, standing alone, sufficient evidence that a franchisee has misreported.  The Court ultimately concludes that ReBath has not met its burden on this issue.[8]

## ii.   Late Payments

In contrast, the Court concludes that ReBath has shown a likelihood of success on the merits on its other proffered basis for termination: Foothills' late royalty and product purchase payments.

The statements showing past-due royalty and product purchase payments, unlike the sales reporting spreadsheet, have indicia of being official ReBath business records, including the ReBath logo, ReBath's contact information, and date stamps.  (Ex. 5 at RB121-25.)  Most important, Woods admitted during the TRO hearing that these records are accurate and that Foothills had been late in paying both the listed royalties and the listed product purchases.[9]

---

[7]     This is also consistent with the Japhet declaration, which notes that "ReBath's controller regularly contacted Foothills and informed it of its underreporting."  (Ex. 10 at RB181 ¶ 5.)

[8]     The Court notes that it is not persuaded by Foothills' argument that only a *knowing* underreport of its sales would constitute an event of default.  Even accepting that this was Woods' subjective understanding of the Franchise Agreement, the default and termination provision is quite clear that although such a knowing misrepresentation is *one* ground for default, § 24.A.7, underreporting sales, regardless of knowledge, is another type of default, § 24.A.10.  (Ex. 4 at RB86.)

[9]     The Court notes that Woods testified that he negotiated an arrangement with ReBath's past CFO to remit product purchase payments on a modified schedule, based in essence on when funds were available.  Ultimately, however, Woods did not contest that he was late in making the product purchase payments.  Additionally, although § 24.B.2 of the Franchise Agreement states that ReBath may make temporary or permanent fee reductions in an effort to work with a franchisee, § 24.B.3 makes clear that "[t]he Company's exercise of its rights under Section 24.B.2 will not . . . be the Company's sole or exclusive remedy for Franchisee's default" and "[i]f the Company exercises any of its

iii.   Termination On Basis Of Default

The Court can understand why, from Foothills' perspective, the tactics employed by ReBath may seem harsh.  ReBath informed Foothills on April 26, 2021 that the Franchise Agreement was "subject to termination" unless Foothills made certain overdue payments within 30 days.  Foothills proceeded to make a payment 10 days later, yet ReBath terminated the Franchise Agreement anyway.

Harsh as this approach may be, it was specifically permitted by the Franchise Agreement.  In § 24.A of the Agreement, various categories of conduct are identified as an "event of default."  (Ex. 4 at RB85-88.)  One of those categories, set forth in § 24.A.8, is when a franchisee fails to make a single payment.  (*Id.* at RB86.)  In that scenario, the missed payment only becomes a default if the franchisee "fails to cure the default within 30 days after receiving written notice of such default."  (*Id.*)  In contrast, § 24.A.20 states that a default occurs when a franchisee fails to make timely payments on three or more occasions in a 12-month period "whether or not the breaches are cured after notice and whether such failures involve the same or different requires or this Agreement."  (*Id.* at RB87.)  Thus, nothing precluded ReBath from invoking § 24.A.8 in the Notice of Default sent on April 26, 2021 and then invoking § 24.A.20 in the Notice of Termination sent on May 6, 2021.  To the contrary, under § 24.B.1, "[i]f an Event of Default occurs, the Company may, in its sole election and upon notice to the Franchisee, declare this Agreement . . . . to be immediately terminated." (*Id.* at RB88.)  Additionally, ReBath made clear in the Notice of Default that it wasn't waiving its right to invoke other remedies under the Franchise Agreement.  (Ex. 104 at FSS255.)

c.   **Intellectual Property**

As noted, ReBath's IP falls into two broad categories: (1) the Marks and (2) the System and Manual.

ReBath has submitted substantial evidence of its Marks.  (Ex. 2.)  Hillier testified to

rights under Section 24.B.2, the Company may thereafter terminate this Agreement without providing Franchisee any additional corrective or cure period . . . ."  (Ex. 4 at RB89.)

the veracity of this evidence, which includes the Marks' federal registrations, and Foothills nowhere disputes the registrations or ReBath's ownership of the Marks. *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010) (registration is "prima facie evidence of the mark's validity and entitles the plaintiff to a strong presumption that the mark is a protectable mark") (quotation marks omitted). ReBath also submitted evidence showing how these materials appear on ReBath franchisees' stationary and marketing materials (Ex. 3) and on Foothills' office and vehicle trailers. (Exs. 27-29.) Woods admitted that the Marks still appear on Foothills' office signs and trailers. Accordingly, the Court finds that ReBath (1) has a valid, protectable mark and (2) Foothills' use of the mark is likely to cause consumer confusion. *OTR Wheel Engineering, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1022 (9th Cir. 2018) (describing elements requirement to prevail on an infringement claim in a trademark case). *See also Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1028 (C.D. Cal. 2011) ("Because the Court finds Wetzel's properly terminated the Franchise Agreement on June 3, 2010, the Court finds that any use of the mark by Defendants after that date was an unauthorized use.").

ReBath has also shown that the Manual and related, propriety confidential information regarding its System constitute trade secrets and are therefore entitled to protection under 18 U.S.C. § 1836 and A.R.S. § 44-401–402. Hillier testified that ReBath has invested considerable time, effort, and money developing its System and Manual and keeping these materials confidential. Further, the Agreement establishes that these materials, including the Manual, remain ReBath's property, are confidential, and must be returned to ReBath upon termination. (Ex. 4 at RB63, RB71, RB89.) Foothills also agreed to stop using these materials upon termination. (*Id.* at RB89.) Foothills ultimately does not dispute that these materials constitute trade secrets, and the Court finds that they do. *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) ("[T]he definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret."). *See also* A.R.S. § 44-401(4) (definition of trade secret with same basic elements).

Foothills' only argument with respect to the likelihood-of-success prong of ReBath's trade secret claims is that because Foothills is "currently effectively out of business," there is and can be no misappropriation.  (Doc. 26 at 13.)  ReBath replies that this does not defeat its claims because Foothills still possesses the Manual and related System information.

The Court concludes that, on this record and for purposes of the TRO motions, ReBath has met its burden with respect to misappropriation.  The federal and the Arizona trade-secrets statutes each define misappropriation to include "breach or inducement of a breach of a duty to maintain secrecy," and each statute authorizes the issuance of a preliminary injunction in cases of "actual or threatened misappropriation."  18 U.S.C. §§ 1836(b)(3)(A), 1839(5)-(6); A.R.S. §§ 44-401(1)-(2), 44-402(A).  Additionally, § 25.A of the Franchise Agreement obligates Foothills to return the trade secrets and stop using them upon termination.  (Ex. 4 at RB89.)  Foothills' noncompliance with this provision means that it possesses the trade secrets when it no longer has permission to do so, in breach of the Agreement.  For purposes of ReBath's TRO motion, this is sufficient to show "actual or threatened misappropriation."  *See also FTC v. Affordable Media*, 179 F.3d 1228, 1237 (9th Cir. 1999) ("[I]t is actually well-settled that an action for an injunction does not become moot merely because the conduct complained of was terminated, *if there is a possibility of recurrence*, since otherwise the defendants would be free to return to their old ways.") (cleaned up).

### d.    **Breach Of Contract**

ReBath's breach of contract claim has two components: (1) breach of Foothills' post-termination obligations under § 25.A (Ex. 4 at RB89-91); and (2) breach of the covenant not to compete under § 26.B (*id.* at RB91-92.)

Although ReBath submitted much less evidence regarding these claims, the Court finds that, for reasons already discussed, ReBath has carried its burden with respect to breach of the post-termination obligations.  It is undisputed that Foothills has not stopped using the Marks and still possesses the trade secrets, in violation of § 25.A.  (Ex. 4 at

RB89.)

In contrast, ReBath has not demonstrated a likelihood of success on the merits of its noncompete claim. Arizona courts do not favor covenants not to compete. *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1281 (Ariz. 1999) ("Despite the freedom to contract, the law does not favor restrictive covenants."). A noncompete covenant is therefore only "enforceable as long as it is no broader than necessary to protect [the party's] legitimate business interest." *Zep, Inc. v. Brody Chem. Co., Inc.*, 2010 WL 1381896, *4 (D. Ariz. 2016). Under Arizona law, it is ReBath's burden "to prove the extent of its protectable interests, and if it cannot, the entire [noncompete] covenant will be deemed unenforceable." *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 979 (D. Ariz. 2006). A court may rule that a noncompete covenant is unenforceable if, for example, the duration is longer than necessary, *Zep*, 2010 WL 1381896 at *5, or if the geographic scope is unreasonably broad, *Valley Med.*, 982 P.2d at 1285.

ReBath has not met its burden on these issues. ReBath made little effort and submitted no evidence to show that the noncompete covenant's two-year duration and 20-mile geographic limitation are no broader than necessary to protect its legitimate business interests.

## 2. Irreparable Harm

"A plaintiff seeking a preliminary injunction must demonstrate that irreparable injury is likely in the absence of preliminary relief. Mere possibility of harm is not enough." *Enyart v. Nat'l Conference of Bar Exam'rs*, 630 F.3d 1153, 1165 (9th Cir. 2011) (citation omitted). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

### a. **Intellectual Property**

The Court finds that Foothills' infringement of the Marks and misappropriation of the trade secrets will likely result in irreparable harm to ReBath.

As for the Marks, the recently enacted Trademark Modernization Act of 2020

- 19 -

("TMA") amended 15 U.S.C. § 1116(a) to provide a plaintiff seeking an injunction "a rebuttable presumption of irreparable harm upon a finding of a violation." Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 226, 134 Stat. 1182 (2020). Foothills' only rebuttal to this presumption is that Foothills is effectively out of business at present. But this argument fails because, as noted, termination of the conduct does not moot the need for an injunction where recurrence is possible. In any event, the Court finds that Foothills' continued possession and use of the Marks prevents ReBath from controlling its reputation and goodwill and threatens the loss of goodwill, which constitutes irreparable harm. *Stuhlbarg*, 240 F.3d at 841; *Athleta, Inc. v. Pitbull Clothing Co., Inc.*, 2013 WL 142877, *10 (C.D. Cal. 2013). *See also Wetzel's Pretzels*, 797 F. Supp. 2d at 1028 ("[G]iven that Defendants are engaging in the unauthorized use of Wetzel's marks, the Court finds that unless Plaintiff is allowed to protect its marks, its ability to control its reputation and goodwill associated with the marks will be significantly reduced.").[10]

The same basic analysis applies to the trade secrets. As Hillier testified, ReBath's System and Manual are the product of decades of development and effort and ReBath goes to considerable lengths to ensure that the trade secrets remain confidential and valuable. Foothills' continued possession and use of these trade secrets, which is no longer authorized by any agreement with ReBath, risks harming ReBath's reputation and goodwill. Also, Foothills has said that it still considers itself entitled to these materials as a ReBath franchisee because the termination was invalid. (Ex. 107.) This is sufficient to show irreparable harm. *Cf. Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1209 (E.D. Cal. 2020) (irreparable harm where evidence suggests that defendants would continue to use trade secrets absent an injunction); *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 853 (N.D. Cal. 2019) ("In trade secret cases, injunctions are appropriate to prevent this sort of unfair advantage.").

---

[10] Hillier acknowledged that, because Foothills is essentially out of operation, this lessens the harm caused by Foothills' continued use of ReBath's brand and Marks. Although the harm may be reduced, the loss of control and potential loss of customer goodwill are still sufficient to establish irreparable harm, especially in light of the presumption created by the TMA. Further, there remains the possibility of recurrence.

b.     **Breach Of Contract**

As noted, the only component of ReBath's breach-of-contract claim as to which it has established a likelihood of success (or even serious questions) is its claim related to the Agreement's post-termination provisions.   That claim is factually entangled with its trademark and trade secrets claims—the core issue is that Foothills has not discontinued its use of the Marks or trade secrets or returned the Manual or other confidential information. Accordingly, for the reasons outlined above with respect to the Marks and trade secrets, the Court finds that ReBath has shown a likelihood of irreparable harm with respect to this aspect of its breach of contract claim.

3.     Balance of Equities

"[D]istrict courts must give serious consideration to the balance of equities." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (citation omitted).   In doing so, courts must consider "all of the competing interests at stake." *Id.*

ReBath has strong interests in protecting the value of its brand, goodwill, and reputation and, for reasons explained above, protecting its Marks and trade secrets are necessary to achieving this goal.   Accordingly, ReBath has a strong interest in the issuance of a TRO.

On the other hand, issuing a TRO against Foothills' use of the IP could subject Foothills to hardship, especially in light of Woods' testimony that Foothills is already effectively out of business.   But these concerns are alleviated somewhat by the Court's denial of the TRO with respect to the covenant not to compete—Foothills can still operate, but it may not infringe ReBath's IP in the process.   Viewed in this light, the balance of equities tips in ReBath's favor.

Further, the weight of the case law supports the conclusion that in cases of trademark infringement, the balance of equities generally tips against the infringer even where issuance of an injunction may cause substantial harm. *See, e.g.*, *2Die4Kourt v. Hillair Cap. Mgmt., LLC*, 692 F. App'x 366, 369 (9th Cir. 2017) ("[W]hen the harm complained of results from a defendant's allegedly infringing conduct, we have . . . approved the entry of

a preliminary injunction."); *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 379 (3d Cir. 1992) ("Durst is certainly harmed by the threat of loss of his franchise, but his self-inflicted harm is far outweighed by the immeasurable damage done Jiffy Lube by the infringement of its trademark.").  *See also Metso Minerals Indus. Inc. v. Oakes*, 2014 WL 1632927, *3 (D. Ariz. 2014) ("The hardship that would be placed on Oakes if the preliminary injunction were granted is mild . . . he would be required to return the 2005 thumb drive and submit his computers to inspection . . . .  Metso would suffer considerable harm if the Court refused to grant a preliminary injunction—Metso would lose exclusive control over confidential information in which it has invested millions of dollars.").

### 4.     Public Policy

The Court likewise concludes that public policy favors the granting of ReBath's TRO motion.  Courts have generally concluded that public policy favors protecting registered trademarks and trade secrets.  *Metso*, 2014 WL 1632927 at *3 ("[G]ranting the injunction is consistent with the public policy of protecting a company's interest in its trade secrets and confidential information."); *Fitness Together Franchise Corp. v. C.P. Body Design, Inc.*, 2010 WL 11628010, *10 (D. Ariz. 2010) ("The public interest in preventing confusion and deception in the marketplace weighs strongly in favor of protecting registered trademarks.").

Foothills' arguments to the contrary are unpersuasive.  Foothills essentially suggests that because it has high customer reputation scores, it would serve the public to allow it to continue operating.  (Doc. 26 at 15-17.)  But this argument presupposes that the Franchise Agreement has not been validly terminated, and thus that it would not constitute infringement or misappropriation for Foothills to continue operations using ReBath's IP. Because ReBath has established a likelihood of success on the merits of its termination, trademark infringement, and misappropriation of trade secrets claims, the public policy favoring trademarks and trade secrets takes hold and suggests that this factor weighs in ReBath's favor as well.

B.     **Foothills' Motion**

Given the Court's findings with respect to ReBath's TRO motion, extended discussion of Foothills' motion is unnecessary.  The Court nonetheless addresses the key reasons why it does not grant a TRO in Foothills' favor.

1.     Likelihood Of Success On The Merits

a.     **Breach of Contract**

As noted, ReBath has shown a likelihood of success on the merits with respect to its interpretation of the Franchise Agreement.  Because ReBath's claims fall under § 32.F of the Agreement, Foothills is not entitled to seek a 30-day abatement to pursue mediation.

As for termination, the Court has explained at length above that, because Foothills likely defaulted under § 24.A.20, ReBath likely had the right to terminate immediately under § 24.B.  This termination in turn triggers ReBath's rights under § 25.  The Court finds that Foothills has not shown a likelihood of success on the merits of this claim.

b.     **Breach Of The Implied Covenant Of Good Faith And Fair Dealing**

At first blush, Foothills' implied covenant claim would seem more likely to succeed than its breach of contract claim.  There is something off-putting about sending a notice of default to a long-term contractual partner that offers a 30-day cure period, only to terminate the relationship on separate grounds roughly 10 days later (and hours after payment was remitted pursuant to the earlier notice).  Nevertheless, the Court finds that Foothills has not carried its burden on this claim.

First, Hillier's testimony, which the Court found forthright and credible, dealt with these issues extensively.  Hillier essentially testified that the purpose of the April 26 letter was to ensure ReBath received the money it was owed from a franchisee whom it had reason to worry would be unable to pay.  The evidence also shows that, until Woods sent the May 13 letter, ReBath was still cooperating with Foothills on the transition to a new franchisee and encouraging Foothills to enter a brokered agreement with the new franchisee.  This is not bad faith or unfair dealing.

Second, in the Notice of Default, ReBath expressly reserved all of its rights under

the Franchise Agreement.  Thus, although it was not unreasonable for Foothills to proceed as though it had 30 days to cure, it was on notice that ReBath might pursue other remedies as well.

Third, in Arizona, it is possible for a party to breach the implied covenant without breaching an express contract term.  *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 29-30 (Ariz. 2002).  But such a breach generally occurs when "one party exercises discretion retained or unforeclosed under a contract in such a way as to deny the other a reasonably expected benefit of the bargain."  *Beaudry v. Ins. Co. of the W.*, 50 P.3d 836, 841 (Ariz. Ct. App. 2002).  The unambiguous terms of the Franchise Agreement make clear that there are at least 20 different grounds for default, and that upon any event of default, ReBath has the right to terminate the Agreement immediately.  (Ex. 4 at RB85-89.)  Given this backdrop, Foothills has not established a likelihood that it was denied a reasonably expected benefit of the bargain.

## 2.   Irreparable Harm

In addition to failing to establish a likelihood of success on (or serious question going to) the merits, Foothills has failed to establish irreparable harm.

The main issue is that Foothills' alleged harm is largely, if not wholly, monetary in nature.  Woods testified that he could calculate the lost profits from the contracts that were lost as a result of ReBath's termination.  Damages are the traditional remedy for breach of contract and a "court will not order specific performance if damages would adequately protect the nonbreaching party's expectation interest."  *County of La Paz v. Yakima Compost Co., Inc.*, 233 P.3d 1169, 1189 (Ariz. Ct. App. 2010).  "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages."  *Ariz. Dream Act Coal.*, 757 F.3d at 1068.

## C.   **Bond**

Section § 32.F of the Franchise Agreement provides that ReBath "will not be required to post a bond or other security in seeking or obtaining injunction relief."  (Ex. 4

1   at RB98.)  Foothills does not contend that a bond is necessary.  Therefore, the TRO may

2   issue without ReBath's posting of a bond.

3          Accordingly, **IT IS ORDERED** that:

4          (1)    ReBath's TRO motion (Doc. 13) is **granted in part and denied in part**.

5   The TRO itself will issue by separate order.

6          (2)    Foothills' TRO motion (Case No. 20-cv-880, Doc. 2) is **denied**.

7          Dated this 9th day of June, 2021.

Dominic W. Lanza
United States District Judge